**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

CITY OF SOCIAL CIRCLE,

                Plaintiff,

     v.

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT; UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY; MARKWAYNE MULLIN, IN
HIS OFFICIAL CAPACITY AS
SECRETARY OF HOMELAND SECURITY;
TODD M. LYONS, IN HIS OFFICIAL
CAPACITY AS SENIOR OFFICIAL
PERFORMING THE DUTIES OF
DIRECTOR OF IMMIGRATION AND
CUSTOMS ENFORCEMENT,

                Defendants.

Case No.

## <u>COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEFF</u>

6195331

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1.      Defendants U.S. Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE") are not above the law.  DHS and ICE plan to build a 10,000-person immigration detention facility in the 5,000-person town of Plaintiff Social Circle, Georgia ("Social Circle").  Federal law requires DHS and ICE to determine what effect their "mega center" would have on the wellbeing of Social Circle's residents and the surrounding environment before the federal agencies finalize their plans.  Defendants conducted no such analysis, instead charging ahead without input from Social Circle's town officials or regard for the significant problems Defendants' facility would cause.

2.      Social Circle's already-strained utility network cannot support the planned facility, which would effectively triple the town's population.  Among other harms, Defendants' plans to imprison up to 10,000 people in a commercial warehouse would overwhelm Social Circle's fresh water supply and sewage treatment capabilities—resulting in dry taps and raw human waste spills.  But, as explained below, Social Circle is not defenseless against Defendants' ill-conceived overreach.  This Court should halt DHS and ICE's plans because they fall far short of the requirements of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") and would create a public nuisance under Georgia state law.

3.      On or around February 3, 2026, Defendants DHS and ICE purchased a commercial warehouse ("the Warehouse") located at 1365 East Hightower Trail in Social Circle with the intention of converting it into an immigration detention "mega center" to imprison 10,000 people.  *See* Ex. 1, Dep't Homeland Sec., *ICE Detention Reengineering Initiative* (Feb. 12, 2026) ("ICE Detention Reengineering Initiative").  Defendants purchased the warehouse without any prior communication or discussion with Social Circle.

4.      Defendants' decision to establish a mass detention facility at the Warehouse constitutes a final agency decision: Defendants purchased the site, confirmed to Social Circle government officials that the site will be converted to an immigration detention center by June

6195331

2026, and have drafted a floor plan and design to convert the Warehouse from a vacant industrial site into a prison.

5.    Defendants' Warehouse plan is part of their broader nationwide effort to create a new mass detention network.  Defendants have purchased warehouses across the country and are seeking to transform them into detention and processing centers that can hold tens of thousands of people, in service of ICE's stated goal to operate "like (Amazon) Prime, but with human beings."  *See* Jerod Macdonald-Evoy, *ICE Director Envisions Amazon-Like Mass Deportation System: 'Prime, but with Human Beings'*, Ariz. Mirror (Apr. 8, 2025), https://perma.cc/W9SK-XR6M.

6.    Converting the Warehouse into an immigration detention "mega center" will harm Social Circle's public health, safety, and environmental interests.  The influx of up to 10,000 detained individuals into Social Circle—not to mention the additional 2,500 persons Defendants plan to employ at the Warehouse—would strain far beyond capacity the local clean water and sewage treatment systems, which are already operating at or near their limits.  If brought online, Defendants' planned "mega center" would threaten water availability for Social Circle's residents and risk sewage overflows into nearby land and water, among other significant harms.

7.    In rushing to purchase and convert the Warehouse into an immigration detention facility, Defendants failed to meaningfully grapple with any of these shortcomings, in violation of federal and state law.  NEPA and the APA serve to ensure federal agencies act in a transparent manner, engage in reasoned decision-making, and analyze feasible alternatives.  NEPA requires federal agencies to conduct an environmental review and prepare a detailed statement of environmental impacts before taking any major federal action, ensuring both that environmental considerations are integrated into the decision-making process and that local governments and members of the public have access to relevant information so they may play an informed role.  The APA likewise requires reasoned decision-making by federal agencies, including consideration of adversely affected interests and any reasonable alternatives.  And Georgia law protects the public from actions that harm their health, safety, and wellbeing.

6195331

8. Defendants have flagrantly disregarded these legal requirements. DHS and ICE did not conduct a public NEPA review of the project's likely impacts on the environment before deciding to purchase the Warehouse for the purpose of converting it into an immigration detention facility. That failure is ongoing. Similarly, in their haste to expand their detention capacity by purchasing the Warehouse, Defendants have failed to exhibit the reasoned decision-making required by the APA.

9. By providing only scant information to local officials regarding plans for the Warehouse, Defendants have deprived Social Circle of an opportunity to fully assess the harm that Defendants' actions will inflict on the town and its residents. But the limited information Defendants have provided indicates that their Warehouse project will overburden Social Circle's infrastructure and impair the health and safety of the town's residents.

10. Because Defendants' actions are unlawful under NEPA, the APA, and Georgia public nuisance law, this Court should vacate Defendants' decision to convert the Warehouse into a massive immigration detention facility. The Court should also enjoin any further implementation of that decision, including but not limited to any further activity related to construction or retrofitting of the Warehouse.

## JURISDICTION AND VENUE

11. Jurisdiction in this Court is proper under 28 U.S.C. § 1331.

12. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Plaintiff City of Social Circle resides in this District, and a substantial part of the acts or omissions giving rise to this action occurred in this District.

## PARTIES

### I. PLAINTIFF

13. Known as "Georgia's Greatest Little Town," Plaintiff City of Social Circle is a municipality primarily located in Walton County, Georgia. It was incorporated in 1869.

6195331

Located about fifty miles east of Atlanta, Social Circle spans 11.2 square miles and is home to about 5,000 residents.

## II.    DEFENDANTS

14.    Markwayne Mullin is the Secretary of Homeland Security and the head of the U.S. Department of Homeland Security.  He is sued in his official capacity.

15.    The U.S. Department of Homeland Security is a department of the Executive Branch of the United States government.  DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

16.    Todd Lyons is the Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement.  He is sued in his official capacity.

17.    ICE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).  ICE is under the supervision of DHS.

## BACKGROUND

18.    Federal law requires federal agencies to act transparently and reasonably.  NEPA was designed to ensure that environmental considerations are integrated into agencies' decision-making processes and that the public has access to relevant information.  The APA likewise requires reasoned decision-making, including consideration of adversely affected interests and any reasonable alternatives.  And Georgia law has long protected the state's residents from unhealthy, unsafe, and detrimental conduct that constitutes a public nuisance.

19.    Here, Defendants have abandoned their legal responsibilities.  In their rush to confine thousands of immigrants in Social Circle, Defendants have failed to consider how their plans to convert the Warehouse into a detention facility will impact the safety and health of Social Circle's residents, the town's infrastructure and resources, and the local environment.  If allowed to proceed with their plan to transform Social Circle into the site of one of the nation's largest immigration detention facilities, Defendants will cause immense and irreparable harm to Social Circle and its residents.

4

6195331

I.    **NEPA REQUIRES FEDERAL AGENCIES TO CONSIDER THE ENVIRONMENTAL IMPACTS OF MAJOR FEDERAL ACTIONS BEFORE ACTING.**

20.    Congress enacted NEPA "to promote efforts which will prevent or eliminate damage to the environment and biosphere."  42 U.S.C. § 4321.  Recognizing "the profound impact of man's activity on the interrelations of all components of the natural environment," Congress established "the continuing policy of the Federal Government, *in cooperation with State and local governments*, and other concerned public and private organizations, to use all practicable means and measures" to accomplish the Act's goals.  42 U.S.C. § 4331(a) (emphasis added).

21.    Those goals are two-fold: First, NEPA ensures federal agencies consider the environmental consequences of projects before committing resources.  *Sierra Club v. U.S. Army Corps of Engr's*, 295 F.3d 1209, 1214 (11th Cir. 2002); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348, 350–52 (1989) ("NEPA declares a broad national commitment to protecting and promoting environmental quality").  Second, NEPA "ensure[es] that relevant information is made available to members of the public so that they 'may also play a role in both the [decision-making] process and the implementation of that decision.'"  *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engr's*, 833 F.3d 1274, 1278 (11th Cir. 2016) (internal citation omitted).

22.    NEPA accomplishes these goals by mandating "a set of 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences, … and that provide for broad dissemination of relevant environmental information.'"  *Robertson*, 490 U.S. at 350 (internal citation omitted).  These procedures ensure "that environmental concerns be integrated into the very process of agency decision-making," *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979), such that "important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  *Robertson*, 490 U.S. at 349.  Rather than dictate any substantive outcome through these procedures, NEPA ensures that federal officials take enumerated steps to "help[] agencies . . . make better decisions and to

5

6195331

ensure good project management." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 177 (2025).

23.    Chief among NEPA's action-forcing procedures is the requirement that federal agencies undertake a public environmental review before initiating any "major Federal action," 42 U.S.C. § 4332(2)(G), which is defined broadly by NEPA to mean "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).  The statute's underlying procedures vary depending on the expected impact of the "major Federal action" at issue.

24.    An Environmental Impact Statement ("EIS") must be prepared for "every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C)(I).  Because this requirement applies to "proposals," federal agencies must prepare an EIS "at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects."  *Id.* § 4336e(12).

25.    In substance, the EIS must be a "detailed statement by the responsible official" that addresses all "reasonably foreseeable adverse environmental effects which cannot be avoided"; "a reasonable range of alternatives" including a "no action alternative"; "the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action."  42 U.S.C. § 4332(2)(C)(ii)–(v).  The agency must also solicit "the comments and views of the appropriate Federal, State, and local agencies" and make them, along with the EIS, "available to the President, [to] the Council on Environmental Quality[,] and to the public."  *Id.*  "Publication of an EIS, both in draft and final form," shows that the agency considered environmental consequences and ensures "a springboard for public comment[.]"  *Robertson*, 490 U.S. at 349.

26.    If an agency does not expect a proposed major federal action to have a "reasonably foreseeable significant effect on the quality of the human environment, or if the

6

6195331

significance of such effect is unknown," then the agency may issue an Environmental Assessment ("EA") instead of an EIS. 42 U.S.C. § 4336(b)(2). An EA sets forth the basis either for the "agency's finding of no significant impact" or that an EIS is in fact required. *Id.* Like an EIS, the EA must be completed, and published, prior to the agency taking final action. *Id.* An agency's determination that it need not prepare an EIS is itself subject to judicial review. *See, e.g.*, *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998).

27.    An agency can dispense with preparing an EIS and an EA only if it finds that the entirety of the proposed agency action fits within a duly adopted categorical exclusion or if it is excluded from environmental review by another provision of law. *See* 42 U.S.C. § 4336(a)(2), (b)(2). A categorical exclusion is "a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment within the meaning of section 4332(2)(C)." 42 U.S.C. § 4336e(1). DHS itself instructs that a categorical exclusion is only appropriate where the action "[c]learly fits the category described in" a table of enumerated categorical exclusions; it "is not a piece of a larger action"; and "[n]o extraordinary circumstances exist." Dept. of Homeland Sec., Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA), at V-5 (Nov. 6, 2014), https://perma.cc/U2E2-8GH4 (hereinafter "DHS Instruction Manual"). The proposed action must "clearly meet all three conditions" to be categorically excluded. *Id.* at V-4 to V-5. Any categorical exclusion must be invoked before an agency takes action. *Wilderness Watch & Pub. Emps. for Env't Resp. v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004).

28.    NEPA instructs federal agencies to "identify and develop" their own "methods and procedures" to "ensure" that "unquantified environmental amenities and values" are given "appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332(B). Following that directive, DHS has promulgated its own NEPA protocols, along with a NEPA compliance manual. *See Env't Plan. and Historic Pres. Program*, 79 Fed. Reg. 70,538 (Nov. 26, 2014); DHS Instruction Manual.

6195331

29.     DHS acknowledges that "NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS, [or] executed by DHS."  DHS Instruction Manual at III-1.  And for purposes of its own NEPA compliance efforts, DHS has deemed "major federal actions" to include "mission and operations planning," "[a]cquisitions and procurements," and "[a]sset management."  *Env't Plan. Program*, 71 Fed. Reg. 16,790, 16,801 (Apr. 4, 2006).

30.     DHS recognizes that to satisfy NEPA, it must consider a broad range of effects to the quality of the human environment when evaluating a potential action.  Any NEPA analysis by the agency must include consideration of "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" effects.  DHS Instruction Manual at II-2.

31.     DHS itself purports to "require public involvement in the NEPA process for proposed DHS actions."  DHS Instruction Manual at V-11.  Its own manual affirms that "[c]ollaboration with other Federal, Tribal, State, and local agencies, as well as non-governmental organizations and the general public is an effective way to identify environmental issues that need to be considered in DHS planning and decision-making."  *Id.* at IV-6.

32.     Consistent with its internal guidelines, DHS has previously reviewed the environmental impacts of detention facility construction and operation.  *See, e.g.*, Dep't of Homeland Sec., *Final Supplemental Environmental Assessment: Addressing the Proposed Construction, Operation, and Maintenance of a New Joint Processing Center in Laredo, Webb County, Texas* (April 2024), https://perma.cc/ZHH8-XH97.

33.     ICE has likewise previously engaged in the NEPA review process for its immigration detention projects.  In 2021, for example, ICE completed an EA for the El Paso Service Processing Center.  Dep't of Homeland Sec., Immigr. & Customs Enf't, *Final Env't Assessment for El Paso, Texas Service Processing Center* (Sept. 15, 2021), https://perma.cc/VED3-J4BP.  That EA documented ICE's efforts to seek public involvement, including through letters sent to stakeholders and a draft EA published on the DHS website.  *Id.*

6195331

The EA also included a description of the proposed action and three alternatives, including an analysis of the impact that each option would likely have on a broad array of resource areas, including land use, geology, topography and soils, water quality, biological resources, utilities and infrastructure, cultural resources, air quality and climate change, transportation and traffic, noise, aesthetics and visual resources, socioeconomics, environmental justice, and waste management and hazardous materials. *Id.*

## II. THE APA LIKEWISE REQUIRES FEDERAL AGENCIES TO ENGAGE IN REASONED DECISION-MAKING.

34.    "The APA 'sets forth the procedures by which federal agencies are accountable to the public.'" *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (*quoting Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).  At its core, the APA "requires agencies to engage in 'reasoned decision-making,'" *id.* (*quoting Michigan v. EPA*, 576 U.S. 743, 750 (2015)), and thus directs that agency actions be set aside if they are "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A).

35.    Reasoned decision-making means an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*quoting Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  An agency fails to meet this standard if its challenged action "failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

36.    Similarly, "[a]n agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. U.S. Dept. of Transp. & Fed. Aviation Admin.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (*quoting Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008)).

9

6195331

"This principle goes to the heart of reasoned decisionmaking; it is not limited to rulemaking."
*Id.*

37.    Moreover, an agency is expected to comply with its own rules, policies, and procedures.  *See, e.g., United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). An agency may not deviate from its own procedures without providing a reasoned explanation. *See State Farm*, 463 U.S. 29 at 43; *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025).

38.    Further, when agency action breaks with a prior policy or decision, "the requirement that an agency provide reasoned explanation for its action . . . ordinarily demand[s] that it display awareness that it *is* changing position.  An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books.  And of course the agency must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citations omitted, emphasis in the original).

39.    Failure to engage in reasoned decision-making runs afoul of the APA's prohibition against agency actions that are "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

## III.    GEORGIA LAW EMPOWERS MUNICIPALITIES TO BLOCK ACTIONS THAT WOULD CREATE PUBLIC NUISANCES WITHIN THEIR COMMUNITIES.

40.    Georgia law defines a nuisance broadly as "anything that causes hurt, inconvenience, or damage to another."  Ga. Code Ann. § 41-1-1.  A *public* nuisance occurs when it "damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." *Id*. § 41-1-2; *see also Atlanta Processing Co. v. Brown*, 227 Ga. 203, 211 (1971) (A public nuisance "affects rights which are common to all within a particular area.") (citation omitted).  It is unnecessary, however, to demonstrate that every person in a community has actually been hurt by a public nuisance; rather, "it is sufficient if the public nuisance injures those of the public who may actually come into contact with it." *Thompson v. City of Fitzgerald*, 248 Ga. App. 725, 728 (2001).

6195331

41.     A defendant is liable for causing a public nuisance where it controls the cause of the harm creating the nuisance.  *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1337 (N.D. Ga. 2021), *aff'd by Johnson v. 3M Co.*, 55 F.4th 1304 (11th Cir. 2022).  Actual ownership of the property through which the defendant causes harm "is not an essential element of the cause of action for nuisance." *Sanders v. Henry Cnty., Ga.*, 484 F. App'x 395, 399 (11th Cir. 2012) (citation omitted).

42.     Georgia law authorizes a city attorney to file a complaint to abate a public nuisance on behalf of the public.  Ga. Code Ann. § 41-2-4.  A court may issue an injunction to "restrain the nuisance before it is completed" "[w]here the consequence of a nuisance about to be erected or commenced will be irreparable damage and such consequence is not merely possible but to a reasonable degree certain[.]" *Id*.

43.     Defendants are not immune from suit for equitable relief arising from their violations of state law, including for abatement of nuisance.  *See, e.g.*, *Texas v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 200 (5th Cir. 2024); *Perry Cap. v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017); *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 400–05 (3d Cir. 2012).

## IV.     DEFENDANTS ADOPT AN UNPRECEDENTED POLICY FOR EXPANDING MASS IMMIGRATION DETENTION.

44.     Since 2025, Defendants have sought to implement a new policy of mass detention, in which they lock up the vast majority of people they seek to deport, even while the detainees' deportation proceedings are pending.  *See* Kyle Cheney, *Hundreds of judges reject Trump's mandatory detention policy, with no end in sight* (Jan. 5, 2026), https://perma.cc/E434-5XRR.

45.     In service of that mass detention policy, Defendants recently embarked on a new campaign to purchase and convert industrial warehouses around the country into processing and detention centers.  Douglas MacMillan & Jonathan O'Connell, *ICE Documents Reveal Plan to*

6195331

*Hold 80,000 Immigrants in Warehouses*, Wash. Post (Dec. 24, 2025), https://perma.cc/LSH6-FJKQ.

46.     In recent history, Defendants operated detention centers using existing facilities throughout the United States, primarily in conjunction with private contractors and state and local government contracts.  Am. Immigr. Council, *Immigration Detention Expansion in Trump's Second Term* (Jan. 2026), https://perma.cc/U599-95ZS.

47.     Defendants have historically avoided expanding detention space through newly constructed publicly-owned facilities "because of the substantial amount of time needed to design and construct such a facility."  U.S. Gov't Accountability Off., *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* 13 (Jan. 13,  2021), https://perma.cc/DPX3-HL36 ("[O]fficials said that new contracts for ICE-owned service processing centers are not a viable option because of the substantial amount of time needed to design and construct such a facility, coupled with the fact that ICE does not have construction authority.").

48.     But now, pursuant to a "new model" designed to meet Defendants' goal to "increase bed capacity to 92,600 beds . . . by November 30, 2026," Defendants have begun purchasing and converting industrial warehouses into detention facilities.  *See* Ex. 1.  These efforts rely on $45 billion appropriated by Congress in July 2025 for ICE detention centers as part of the One Big Beautiful Bill Act (OBBBA). Pub. L. 119-21, § 90003, 139 Stat. 72, 358 (July 4, 2025).  Nothing in this appropriation purports to excuse Defendants from complying with NEPA, the APA, or state law.

49.     A recent document, labeled "ICE Detention Reengineering Initiative," spells out the details of this new model.  Defendants describe their plans to use their recent funding to "fully implement a new detention model by the end of Fiscal Year 2026."  *See* Ex. 1 at 1.  The effort will "focus[] on non-traditional facilities built specifically to support ICE's needs," including "the acquisition and renovation of eight large-scale detention centers and 16 regional

6195331

processing sites, as well as the acquisition of 10 existing 'turnkey' facilities where ICE ERO already operates." *Id.*

50. The same document states that each of the new "Large-Scale Detention Facilities" will provide "housing [for] 7,000 to 10,000 detainees for periods averaging less than 60 days." *Id.* "These sites will serve as the primary location for international removals." *Id.*

51. The ICE Detention Reengineering Initiative acknowledges that, in establishing the new model, Defendants must still "comply[] with [NEPA] to evaluate the impacts of proposed actions and their reasonable alternatives." The document further claims that "[a]ll detention infrastructure will comply with the latest ICE National Detention Standards . . . , relevant federal regulations, environmental regulations, and industry best practices." Ex. 1 at 2.

52. There is, however, no indication that Defendants have complied with NEPA when deciding to establish a mass detention facility in Social Circle.

## V. DEFENDANTS PURCHASE THE WAREHOUSE IN SOCIAL CIRCLE TO USE AS A LARGE-SCALE IMMIGRATION DETENTION FACILITY.

53. Defendants pushed through their plan to open a detention "mega center" in Social Circle without any meaningful engagement with, or involvement by, the town's government or citizens. Defendants have primarily operated behind closed doors, and Social Circle has been forced to piece together factual developments largely from public reporting and other limited documentation.

54. Social Circle first learned about Defendants' plan to construct the facility on December 24, 2025, through public reporting by the Washington Post. *See* MacMillan & O'Connell, *supra*.

55. Prior to publication of that reporting, Defendants did not inform Social Circle of their plan to open the facility, nor did they communicate in any way with town officials regarding the Warehouse. City of Social Circle, *City of Social Circle Statement Regarding Reports of a Proposed ICE Detention Facility* (Dec. 31, 2025), https://perma.cc/ESZ4-XZHP.

13

6195331

56.     Following that initial reporting regarding Defendants' plans, the Walton County Development Authority sought to verify that reporting by contacting the Warehouse's property owner, PNK, who declined to answer any questions and stated only that it was bound by a nondisclosure agreement.  Town officials ultimately pieced together additional information from state and federal government officials, outreach from the public, and by observing DHS officials touring the Warehouse facility.

57.     On December 31, 2025, Social Circle published a public statement in which it explained the unequivocal opposition of the Mayor and City Council to the establishment of the ICE detention facility in Social Circle.  *Id.*  In particular, Social Circle noted that the detention facility project is infeasible because the town does not have the clean water or sewage infrastructure to support the project.

58.     Shortly before the sale of the Warehouse closed, Congressperson Mike Collins and members of his staff informed Social Circle that PNK was moving towards finalizing the sale to the U.S. Department of Homeland Security for the purposes of establishing a detention facility.  City of Social Circle, *Updated City of Social Circle Statement Regarding Reports of a Proposed ICE Detention Facility* (Feb. 4, 2026), https://perma.cc/SQ5X-WQGM.

59.     By February 8, 2026, the City confirmed the sale of the Warehouse had closed on February 3, 2026, from a general warranty deed executed by Defendants and recorded by the Superior Court Clerk's website.  Ex. 2.  The deed shows that Defendants took ownership of the Warehouse's 235-acre property at 1365 East Hightower Trail for approximately $128 million— nearly five times the property's previously assessed value.  *Id.*; *see also* Timothy Pratt, *Conservative Georgia town pushes back against ICE detention center: 'We are Americans after all'*, The Guardian (Feb. 18, 2026), https://perma.cc/97M7-RFW8.

60.     As of February 8, 2026, Social Circle still had not been contacted by Defendants regarding the Warehouse.  *See* City of Social Circle, *Updated City of Social Circle Statement Regarding Reports of a Proposed ICE Detention Facility* (Feb. 8, 2026), https://perma.cc/Z28A-QTHA.

14

6195331

## VI.    DEFENDANTS FAIL TO CONSIDER BASIC FACTS REGARDING THE IMPACT OF CONSTRUCTING AND OPERATING A DETENTION FACILITY IN SOCIAL CIRCLE.

61.    After the sale of the Warehouse, Social Circle continued its efforts to contact Defendants and obtain information on their plan for the Warehouse. Through outreach from other government officials, DHS agreed to a meeting with Social Circle officials on February 16, 2026.

62.    On February 16, 2026, representatives from DHS met with Social Circle officials to discuss DHS's purchase of the Warehouse and plans to construct a large-scale detention facility. The DHS representatives present at the meeting identified themselves as Tim Kaiser, the Deputy Chief of Staff for U.S. Citizenship and Immigration Services ("USCIS"), Jim Grossmann, and Dillon McGregor. On information and belief, Mr. Grossmann appears to be a private real estate developer from the Boston, Massachusetts area. On information and belief, Mr. McGregor is senior counselor to the Secretary of Homeland Security.

63.    At this meeting, DHS representatives confirmed that the Warehouse in Social Circle would serve as one of eight "mega centers" across the country to confine up to 10,000 people. DHS representatives further explained that, in addition to the 10,000 individuals that would be confined at the Warehouse, up to 2,500 staff members would work at the Warehouse.

64.    DHS representatives also told Social Circle officials that DHS expected to award a construction contract for renovation of the Warehouse into a mega detention center by the end of that week, February 20, 2026. DHS representatives further explained that DHS planned to open the facility for operation and begin intake of individuals detained by ICE by June 2026. Thus, there is an imminent risk that construction on the Warehouse will begin at any point.

65.    DHS representatives provided grossly insufficient responses to Social Circle's concerns during the meeting. For example, when asked how ICE would supply clean water to the facility, DHS representatives stated that the current infrastructure would be sufficient. When pressed on where Defendants planned to source the facility's clean water, DHS representatives stated the agency would rely on Social Circle's water supply during off-peak hours. When

15

6195331

Social Circle officials explained that the use of water, regardless of timing, would far exceed the town's permitted water usage and local treatment facility's capacity, DHS representatives merely suggested that Defendants would consider alternatives—all of which are improbable or infeasible—such as trucking in huge quantities of water or drilling a well. DHS did not respond to Social Circle's question as to whether the agency would provide financial assistance for any of the upgrades the town would need to implement to support the detention facility's water usage.

66.    Regarding sewage, DHS stated during the meeting that it expected to construct an onsite treatment plant and that sewage sludge would be hauled away and disposed of elsewhere. When asked about the liquid effluent created by such a treatment plant, DHS estimated that the detention facility would produce about one million gallons of wastewater daily and that DHS expected to use municipal resources to treat and discharge this wastewater. Social Circle officials explained that the municipal treatment plant was already operating at capacity, and that Social Circle's planned expansion of the treatment plant—which would not be completed for another 12 to 18 months, and which then would only process one and a half million gallons of wastewater per day—would still be insufficient to accommodate the detention facility's projected discharge along with the town's wastewater needs. DHS representatives responded that they did not believe Social Circle's numbers and that they believed the area had at least four million gallons of excess wastewater treatment capacity. DHS representatives indicated that this figure relied on DHS's assumption that the town's planned wastewater treatment expansion would increase Social Circle's capacity to three million gallons per day and that DHS could rely on additional capacity supplied by wastewater treatment plants in Newton County and Clayton County.

67.    On information and belief, neither the Newton County treatment plant nor the Clayton County treatment plant is connected to the Warehouse site, with Clayton County's treatment facility located approximately 35 miles from the Warehouse. Social Circle officials later confirmed with Newton County officials that no one from DHS had contacted the county to confirm whether excess capacity from its treatment plant was available.

6195331

68.     Social Circle officials also asked DHS about its plans for emergency services. DHS representatives responded that they anticipated transporting individuals to nearby hospitals for treatment using DHS's own transportation or public buses, and that DHS did not anticipate needing additional fire or police resources from the town.

69.     DHS representatives did not provide substantive information regarding DHS's regulatory or legal obligations, stating only that the facility would meet or exceed federal detention standards and that DHS had completed the necessary studies, including an economic analysis, and that DHS had exercised due diligence.  Social Circle officials requested a copy of this economic analysis but never received it.

70.     Following the February 16, 2026 meeting, Social Circle promptly informed the public of the information provided by DHS representatives.  *See* City of Social Circle, *Updated City of Social Circle Statement Regarding Reports of a Proposed ICE Detention Facility* (Feb. 18, 2026), https://perma.cc/S6N6-J272.

71.     A few days after the February 16, 2026 meeting, DHS representatives issued to Social Circle officials a document purporting to describe ICE's plans to transform the Warehouse into a 10,000-bed immigration detention facility.  *See* Ex. 3.  The planning document notes that the Warehouse property currently covers 183 acres and contains over 1 million square feet of structure, which may be increased to over 2.3 million square feet.  *Id.* at 1.  The document includes a proposed floor plan for the detention facility which includes holding areas, indoor and outdoor gyms and recreational spaces, court facilities, intake areas, cafeterias, laundry facilities, on-site health services, and a gun range:

17

6195331



*Id.* at 12.

72.    The ICE planning document mirrors many of the same unsupported assumptions and statements that were expressed by DHS representatives during the February 16 meeting.  For example, the ICE planning document asserts that the proposed detention facility will "not affect the existing infrastructure adversely in any way," that the facility will utilize "on-site containment and generation for the utilities needs," and that the "engineering approach" to equipping the Warehouse "[will] not adversely affect[] the municipal infrastructure."  *Id.* at 3.  The planning document proclaims that the detention facility "will provide no adverse effect[s] on the community and surrounding properties."  *Id.* at 6.

73.    The ICE planning document does not contain any analyses, reports, or other evidence to support these claims.  To the contrary, it is devoid of any details as to the construction process that will be needed to convert the vacant Warehouse into a detention facility

6195331

to confine thousands of individuals. The planning document further fails to explain any possible impacts of the project on the environment or natural resources. It does not address how solid or hazardous waste will be generated, treated, stored, or disposed of. Nor does it specify the projected demands on various utilities, such as power.

74. To the extent that the planning document estimates the demand as to certain utilities, *see* Ex. 3 at 3, it provides no explanation for how those projections were calculated. Nor does it explain DHS's various assumptions regarding Warehouse "capacity" to meet certain utility demands. For example, the planning document acknowledges that the Warehouse project will generate over one million gallons per day of wastewater. This is nearly 50% beyond the capacity of the town's existing infrastructure—which is already operating at capacity—to process wastewater for the entirety of the Social Circle population. *Id.* at 3; *Updated City of Social Circle Statement*, (Feb. 18, 2026). Additionally, the planning document acknowledges that there is insufficient information to determine whether the local wastewater treatment plant has adequate capacity to support the Facility. *See* Ex. 3 at 6. Despite this, the planning document insists that the Warehouse will not adversely impact local infrastructure. *Id.*

75. Moreover, the planning document relies upon false assumptions about future infrastructure upgrades that Social Circle is contemplating. *Id.* at 2–3. For example, the document references Social Circle's plans to build a new sewer treatment plant, implying that the Warehouse will take advantage of the projected three million gallons per day in capacity gains that the new plant will provide. *Id.* But that expansion project has not begun, it will take at least one year to complete, and even then, the upgraded facilities still would not have enough capacity to handle the projected increased load from the Warehouse. *See Updated City of Social Circle Statement*, (Feb. 18, 2026).

76. Furthermore, the ICE planning document summarily asserts various "mitigation" measures that may be taken with regards to certain utility demands, but it fails to explain how those mitigation measures will be implemented. Ex. 3 at 3. For example, the document indicates the potential for on-site wastewater treatment, *id.*, but it neglects to explain "where the resulting

19

6195331

liquid effluent would be . . . discharged." *See Updated City of Social Circle Statement*, (Feb. 18, 2026). Defendants' reference to on-site treatment also "raises concerns regarding potential impacts to local wetlands[,] depending on the final [effluent] disposal location." *Id.* The planning document also proposes mitigating wastewater capacity issues by upgrading monitoring systems, buffering peak flows, and staggering high volume activities. Ex. 3 at 3. But the plan neglects to mention that DHS has not conferred with local water authority management to confirm that these measures would be feasible or effective. *Id.* Indeed, these measures would be futile because the total additional effluent amount would far exceed the municipal system's load and treatment capacity.

77.     With respect to water supply, the ICE planning document references a cistern-based approach in which tanks would be filled from local municipal systems during off-peak hours. *Id.* at 3. But, regardless of the time of day, Social Circle's infrastructure cannot accommodate this level of demand; the total additional water demand required for a facility of this scale exceeds what Social Circle's system is capable of providing. *See Updated City of Social Circle Statement*, (Feb. 18, 2026). Supplying that volume would require substantial infrastructure expansion, new permitting, and significant investment that does not currently exist. *Id.* When Social Circle officials asked whether DHS would provide financial assistance for such upgrades, representatives did not answer and instead suggested hypothetical alternatives, such as drilling a well on the property or transporting water from off-site sources. *See id.* These hypotheticals only raise a host of additional unanswered questions as to the impact of such plans on the town's environment and natural resources.

**VII.   DEFENDANTS' DECISION TO PURCHASE THE WAREHOUSE AND CONVERT IT INTO A MASSIVE IMMIGRATION DETENTION FACILITY WILL HARM THE TOWN'S INTERESTS, PUBLIC RESOURCES, AND THE LOCAL ENVIRONMENT.**

78.     Converting this currently vacant Warehouse into a 10,000-bed detention facility and jobsite for 2,500 workers would require major construction and would substantially change

20

6195331

the character, purpose, function, and environs of the Warehouse.  This would overwhelm the town's resources and negatively affect the local environment.

79.    The Warehouse is a vacant site that will require significant construction in order to serve Defendants' carceral aims.  The Warehouse is not currently designed to house, feed, bathe, protect, or provide adequate care to anyone, let alone 10,000 people detained by ICE, plus an additional 2,500 workers employed at the facility.

80.    The Warehouse was constructed to serve commercial and logistics needs.  Grant Blankenship, *ICE bought a warehouse in Social Circle, Ga. The city wishes it hadn't*, Ga. Pub. Broad. (Feb. 13, 2026), https://perma.cc/LHS3-J6HE.  On information and belief, no permits have ever been issued for the site to serve as housing for any individuals, let alone 10,000 imprisoned people.

81.    Indeed, ICE's own National Detention Standards require substantial redevelopment of the Warehouse.  Among other things, the Standards require Defendants to construct a "secure perimeter" equipped with a "sally port," "reasonably private bathing and toileting environment[s]," and an "emergency electrical power generator."  *See* Dep't Homeland Sec., *ICE National Detention Standards* at 5, 25, 128 (2025).  The Standards also require Defendants to ensure that "[p]otable water [is] available throughout the facility," and that "[e]nvironmental health conditions will be maintained at a level that meets recognized standards of hygiene," including those set by "the Occupational Safety and Health Administration (OSHA), the Environmental Protection Agency (EPA), the Food and Drug Administration (FDA), the National Fire Protection Association (including the Life Safety Code (NFPA 101)), and the Centers for Disease Control and Prevention (CDC)."  *Id.* at 5–6.

82.    The Standards also provide that detention facilities "shall ensure appropriate temperatures, air and water quality, ventilation, lighting, noise levels, and detainee living space, in accordance with any applicable state and local jail/prison standards."  *Id.* at 7.

83.    Any attempt to convert the Warehouse into an immigration detention facility that comports with these requirements—along with the operation of such a facility once

6195331

constructed—would burden local infrastructure and resources, which are not equipped to support such a dramatic shift.  Further, conversion of the Warehouse into an immigration detention facility would pose substantial risks to the surrounding environment.

84.     *Water Systems*: Converting the Warehouse into a detention facility confining up to 10,000 people at a time would impose an additional estimated 1.113 million gallons per day of water demand on a system with insufficient capacity for that additional demand.  *See* Ex. 4 (Turnipseed Engineers Feb. 26, 2026 Letter) at 1.  Prior to Defendants acquiring the Warehouse for conversion into a detention facility, the water demand for the Warehouse was estimated to be 29,600 gallons per day.  *See* Ex. 5 (NEGRC, *Developments of Regional Impact Final Report* (DRI#3691)) at 3.

85.     By further straining an already stressed water system, Defendants threaten the viability of Social Circle's entire system.  Potable water to the Warehouse is currently supplied by municipal water services, which run through Social Circle's single water treatment plant.  The plant does not have sufficient capacity to meet the additional water demand of a detention facility housing up to 10,000 people.

86.     *Sewer Systems*: Defendants' plans for the Warehouse also would overwhelm the local wastewater conveyance system.  Conversion of the Warehouse into a mass detention facility to confine 10,000 people would likely increase the wastewater output to over one million gallons per day.  *See* Ex. 4 at 1.  Such an expanded, unplanned, and ongoing wastewater discharge poses a serious risk of exceeding contractual flow limits and the hydraulic capacity of the conveyance system, thereby causing sewer main backups, overflows at the municipal wastewater plant and pump stations, and contamination of groundwater and local waterways.

87.     The wastewater currently flowing from the Warehouse is ultimately conveyed through Social City's municipal wastewater treatment plant, which discharges treated wastewater into the Little River, a waterway that flows to numerous downstream users for public services and recreational activities.

22

6195331

88.     If the Warehouse were converted into a detention facility housing up to 10,000 individuals, its projected wastewater output would balloon to an estimated 1,001,683 gallons per day—nearly two times greater than the current 666,720 gallon-per-day limit for the whole town. Ex. 3 at 3; Ex. 4 at 1.

89.     The existing conveyance system has insufficient capacity to convey the additional anticipated flow from the proposed detention facility.  Wastewater flow exceeding the capacity of the existing infrastructure poses serious risks of damage to the sewer system and sewage overflows into nearby land, groundwater, and waterways.  Furthermore, the increased flow that does reach the treatment plant would overwhelm the system's current capacity, reducing the effectiveness of water treatment and causing insufficiently treated effluent to be discharged from the system into the Little River.

90.     ***Public Health and Safety***:  Defendants' conversion of the Warehouse into a 10,000 bed detention facility is likely to place additional burdens on essential public services in light of public reporting of conditions at Defendants' detention facilities around the country revealing evidence of disease outbreaks, sewage problems, and generally unsanitary conditions. *See, e.g.*, María Luisa Paúl, et al., *Measles Cases Identified at ICE's Largest Detention Facility for Children*, Wash. Post (Feb. 3, 2026), https://perma.cc/R68E-UVP8; Rachel Handley, *Louisiana ICE detainees report mice, sewage, and delayed medical care at processing facilities*, WWL Louisiana (Feb. 11, 2026), https://perma.cc/7RDF-YM7N; ACLU, Am. Oversight & Physicians for Hum. Rts, *Deadly Failures: Preventable Deaths in U.S. Immigration Detention* 8–10, 37, 41–44, 48(2024), https://perma.cc/YMZ7-BZPA; Nathan C. Lo et al., *Influenza, Varicella, and Mumps Outbreaks in US Migrant Detention Centers*, 325 JAMA 180, 180–82 (2021), https://perma.cc/9TN5-UQMB; Dhruv Mehrotra and Dell Cameron, *'They're Not Breathing': Inside the Chaos of ICE Detention Center 911 Calls*, WIRED (June 25, 2025), https://perma.cc/K98P-GUX2 /; Laura Romero, *911 calls from ICE detention center underscore concerns about conditions, advocates say*, ABC News (Mar. 4, 2026), https://perma.cc/66L7-73WK.

23

6195331

91.     Given this potential for major disease outbreak, in combination with other public health risk factors, the planned facility is likely to generate a high volume of emergency incidents.

92.     Social Circle's public resources are not prepared to respond to health emergencies arising within the intended facility without jeopardizing the town's ability to meet its existing needs.

93.     Furthermore, Social Circle officials and residents have expressed concerns regarding safety and security.  The detention center will be located directly adjacent to several residential properties, less than 1,000 feet away from a residential subdivision, and less than a mile away from Social Circle Elementary School.

94.     As a result, school officials and parents are concerned about the safety of the 1,100 children enrolled at the elementary school, whose school environment may be adversely affected by a detention center located in such close proximity.  This proximity to sensitive locations is especially troubling given Social Circle's limited law enforcement resources.  With a local police force of only fifteen officers on patrol, it is unclear how Social Circle will be able to manage any safety concerns that may arise when the detention center effectively triples the town's population.  Similar uncertainties exist with respect to emergency medical services (EMS) due to Social Circle's modest EMS capacity and DHS' nebulous plan for emergency transport at the detention center.  *See* Letter to Secretary Mullin and Director Lyons, *Offices of United Senators Warnock and Ossoff* (Mar. 24, 2026), https://perma.cc/8KHX-RHS7.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Administrative Procedure Act**
**Action that is Contrary to Law (NEPA, 42 U.S.C. § 4321, *et seq*.)**

95.     Social Circle realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this complaint.

24

6195331

96.    Under the APA, a Court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

97.    Defendants' decision to purchase the Warehouse for purposes of converting it into an immigration detention facility constitutes final agency action reviewable under the APA.

98.    The finality of this decision is evidenced by Defendants' purchase of the Warehouse (for $128 million, or nearly five times its previously assessed value) expressly for the purpose of converting it to and using it as a detention facility to confine up to 10,000 people. The finality of this decision is further confirmed by Defendants' issuance of a document setting forth its plans—including a floorplan and blueprint—for the design of the detention facility. *See* Ex. 3.

99.    To Social Circle's knowledge, Defendants have not consulted with any federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved with the decision to purchase the property and convert it into an immigration detention facility.

100.    Defendants did not collaborate with Social Circle prior to purchasing the property or at any point in the process of developing their renovation and operation plans for the facility.

101.    Defendants' decision to purchase, construct, and operate an immigration detention center to confine up to 10,000 people is a "major Federal action[]" with impacts on the human environment that must be evaluated under NEPA.  42 U.S.C. § 4332(C).

102.    This "major Federal action" is under Defendants' substantial direction and control.  42 U.S.C. § 4336e(10)(A).

103.    To Social Circle's knowledge, Defendants have prepared neither an EIS nor an EA with respect to the Warehouse.

104.    To Social Circle's knowledge, Defendants have not invoked any categorical exclusion that could excuse ICE from reviewing the Warehouse project under NEPA.

6195331

105.    Nor does it appear that any categorical exclusions could apply here.  For example, the proposed detention facility does not qualify as an administrative or regulatory activity.  *See id.* at A-1 to A-3.  Such exclusions permit "relocation of personnel" only where the action does not "exceed[] the infrastructure capacity or change[] the use of space."  *Id.*  Yet Defendants' plan demands a change in the Warehouse's commercial use, and it far exceeds the Warehouse's current capacities.  Nor can the "operational activities" exclusion apply, *see* DHS Instruction Manual at A-3, as it is limited to actions that do not "substantially increase the extent of potential environmental impacts" and are not "controversial."  *Id.*  The exclusion for "construction, installation, and demolition activities" is likewise inapplicable.  *See id* at A-8.  That provision applies only where new construction is "consistent with those existing, adjacent, or nearby buildings" and does not "result in uses that exceed existing support infrastructure capacities," including roads, sewer, water, and parking.  *Id.* at A-7 to A-8.

106.    Even if Defendants purported to invoke a categorical exclusion, the presence of "extraordinary circumstances" would preclude its application here.  *See* DHS Instruction Manual at V-5.  Such circumstances include actions with potentially significant effects on "public health or safety," impacts to "environmentally sensitive areas," or projects of a scope or size "significantly greater … than normally experienced" for the category.  *Id.* at V-6, V-9.  This unprecedented 10,000-person detention facility would have significant impacts on both the surrounding environment and the public health and safety of a town of approximately 5,000 residents, whose infrastructure is already near capacity.  *See* Ex. 5 at 2–3.  Moreover, the project, developed pursuant to Defendants' reengineering initiative, reflects an operation far larger in scope than typical ICE facilities.  *See* Ex. 1.  Extraordinary circumstances foreclose reliance on any categorical exclusion.

107.    Defendants' failure to follow their own protocols and conduct the required environmental review under NEPA has deprived the town and the public of the procedures to which they are entitled by law.

6195331

108.    The Court should vacate and set aside Defendants' decision to purchase the Warehouse for the purpose of converting it into an immigration detention facility and enjoin any further implementation of the decision to convert the Warehouse into an immigration detention facility, including but not limited to any further activity related to construction or retrofitting of the property.

## COUNT II
### Violation of the Administrative Procedure Act
### Agency Action that is Arbitrary and Capricious (5 U.S.C. § 706)

109.    Social Circle realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this complaint.

110.    The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).

111.    In addition to being contrary to law, Defendants' decision to move forward with the project, including by purchasing and developing the Warehouse, is arbitrary and capricious. Defendants have not offered "a satisfactory explanation for [their] action," nor have they established any "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation omitted)).  Likewise, Defendants have not given any explanation—let alone a reasoned explanation—for their rejection, or even their consideration, of reasonable alternatives.

112.    Nor have Defendants given any explanation—let alone a reasoned explanation— for their change in previous position that NEPA review is required for projects that involve the purchase, construction, renovation, and operation of immigration detention and processing centers.

113.    Defendants also failed to consider important aspects of the problem, including the immediate impact that this decision will have on public health and safety, and the long-term impact of the agency's decision to purchase and convert the Warehouse into an immigration detention facility.

27

114.    In pursuing the project, Defendants also have failed to follow their own regulations, protocols, and standards.

115.    The Court should vacate and set aside Defendants' decision to purchase the Warehouse for the purpose of converting it into an immigration detention facility and enjoin any further implementation of the decision to convert the Warehouse into an immigration detention facility, including but not limited to any further activity related to construction or retrofitting of the property.

**COUNT III**
**Abatement of Public Nuisance**
**(Ga. Code Ann. §§ 41-1-2; 41-2-4)**

116.    Social Circle realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this complaint.

117.    Georgia law defines a nuisance broadly as "anything that causes hurt, inconvenience, or damage to another." Ga. Code Ann. § 41-1-1. A public nuisance occurs when a nuisance "damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." *Id.* § 41-1-2. The City Attorney may bring an action for injunctive relief to prevent or abate such a public nuisance. *Id.* § 41-2-4.

118.    Defendants' plan to create an on-site wastewater treatment facility designed to treat over a million gallons of wastewater per day will produce sewage sludge and liquid effluent. Defendants have provided only woefully insufficient hypotheticals of how they would dispose of these waste products. Disposing of liquid effluent into the town's municipal system, as Defendants plan to do, will quickly overwhelm this system, causing massive overflows into local waterways. Eventually, overflows will reach local waterways and/or the surrounding groundwater, contaminating Social Circle's clean water supplies and posing a substantial risk to public health and the environment.

119.    Defendants' proposed alternatives are equally unviable. The A. Scott Emmons Water Reclamation Facility is located in another county and, upon information or belief, has no connection to the Warehouse location. Clayton County's wastewater treatment plant is located

28

6195331

over 35 miles from the Warehouse and likewise has no connection to the facility.  To the extent Defendants plan to rely on Social Circle's construction of a larger water treatment facility, that facility will not be implemented for at least another 12–18 months and will only have a capacity of 1.5 million gallons per day, which still would not be enough to accommodate the projected demand of the detention center along with Social Circle's existing demand.

120.    Defendants' use of public wastewater facilities will inevitably overwhelm the available system, leading to probable system disfunction and failure.  The resulting overflow of untreated or insufficiently treated sewage effluent would inevitably escape through overflow events, system bypasses, or groundwater migration, eventually reaching local waterways upstream from public watersheds and aquifers.  These consequences create substantial risks to public health and will likely cause sewer service disruption, which will harm and inconvenience all residents connected to the public sewer system.

121.    Defendants also plan to use Plaintiff's clean water services, but the public water supply is insufficient to meet the demand that would be imposed by a facility for imprisoning 10,000 people and staffing another 2,500 people.  This would require the public supply to provide water to over three times as many people as it currently does—a minimum of 1.1 million additional gallons per day.

122.    Unless abated, Defendants' use of the public water supply would substantially deplete the supply available to Social Circle's residents, schools, hospitals, businesses, and local emergency services.  Furthermore, reduced system pressure would lead to degraded water quality, at great risk to public health, affecting every resident who relies on the town's drinking water supply.

123.    By creating and maintaining conditions through which the town's infrastructure will be damaged, waterways will be contaminated, and the clean water will be depleted, Defendants will cause severe and foreseeable injury to the public.

124.    In sum, through their planned actions and omissions, Defendants will create a continuing public nuisance.

29

125.   Accordingly, the Court should enjoin any further implementation of the decision to convert the Warehouse into an immigration detention facility, including but not limited to any further activity related to construction or retrofitting of the property.

## PRAYER FOR RELIEF

WHEREFORE, the City of Social Circle prays that this Court:

i.   Declare that Defendants' decision to purchase, convert, maintain, and operate an immigration detention facility at the Warehouse is contrary to law and violates NEPA, the APA and the Georgia law;

ii.   Vacate and set aside Defendants' decision to purchase the Warehouse for the purpose of converting it into an immigration detention facility;

iii.   Restrain, enjoin, and stay Defendants from further implementing their decision to convert the Warehouse into an immigration detention facility;

iv.   Grant such other relief as this Court may deem proper.

//

//

6195331

Respectfully submitted,

Dated:  May 13, 2026                    KEKER, VAN NEST & PETERS LLP


By:     */s/ Christopher S. Sun*
        R. ADAM LAURIDSEN *(pro hac vice forthcoming)*
        CHRISTOPHER S. SUN (Georgia Bar No. 589078)
        W. HAMILTON JORDAN *(pro hac vice forthcoming)*
        ASEEM MEHTA *(pro hac vice forthcoming)*
        SONJA N. RILEY-SWANBECK *(pro hac vice forthcoming)*
        JULIE A. HUNTER *(pro hac vice forthcoming)*
        KEKER, VAN NEST & PETERS LLP
        633 Battery Street
        San Francisco, CA 94111-1809
        Telephone:  415 391 5400
        Facsimile:  415 397 7188
        alauridsen@keker.com
        csun@keker.com
        wjordan@keker.com
        amehta@keker.com
        sriley-swanbeck@keker.com
        jhunter@keker.com

        Attorneys for Plaintiff

31

6195331